J. B. Cage et al. * v. Commissioner. Cage v. Commissioner
Docket Nos. 25269, 25270, 25271, 25272, 25273, 25274, 25275, 25276.
United States Tax Court
1950 Tax Ct. Memo LEXIS 90; 9 T.C.M. (CCH) 847; T.C.M. (RIA) 50235; September 28, 1950
*90 The fair market value of an oil and gas lease, at the time it was distributed by a corporation to its stockholders incident to dissolution, determined. Wesley E. Seale, Esq., 1108 Wilson Bldg., Corpus Christi, Tex., and Charles E. Pratt, Esq., for the petitioners. Joseph P. Crowe, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent has determined deficiencies in income tax against the petitioners for the taxable year December 31, 1945, in the following amounts: Petitioner
Docket No.
Deficiency
J. B. Cage
25269
$ 781.68
L. M. Cage
25270
752.87
L. N. Cage
25271
1,625.82
L. A. Cage
25272
1,580.82
Jewel Boykin
25273
618.54
C. C. Boykin
25274
598.54
Ruth Boykin
25275
689.92
F. M. Boykin, Jr.
25276
689.92
The sole question concerns the fair market value of the interest of the Central Oil Company in an oil and gas lease at the time it was distributed to the petitioners as stockholders incident to the dissolution of the company on or about July 31, 1945. Findings of Fact Petitioners are individuals residing at Taft, Texas, whose income tax returns for 1945 were filed with the collector *91 of internal revenue for the first district of Texas. Petitioners were stockholders of the Central Oil Company, a Texas corporation, hereinafter referred to as Central, which was dissolved on or about July 31, 1945. At the time of its dissolution, Central owned 13/32nds interest in an oil and gas lease, hereinafter referred to as the Scrivener lease, consisting of 80 acres of land located in the Midway field, San Patricio County, Texas, which it distributed to the petitioners as its stockholders upon dissolution. The Scrivener lease is situated in the western part of the Midway field and as of the date of Central's dissolution contained 12 producing wells. The structure of the Midway field resembles a symmetrical dome. The west side of the structure is faulted. The fault, which has a displacement from 80-85 feet, runs in a generally northeast-southwest direction and seals off the western part of the Midway field on the south and east. The structure resembles an inverted funnel, with the pay sands fanning out from the fault in a northerly and westerly direction. The fault cuts off part of the 80 acre tract contained in the Scrivener lease and leaves approximately 48 acres in the *92 producing area, which is situated at the apex of the structure and up against the fault. The major expulsive agent is a water drive from the north and west found at approximately the minus 6,040 foot level. The water drive is more effective from the north, causing a greater encroachment of water in the northern part of the structure and resulting in wells in that area making from 50-98 per cent salt water at a level considerably higher structurally than wells on the west and south reporting little or no water. Prior to dissolution, Central's officers and directors employed Frith C. Owens, a petroleum engineer, to conduct an examination of the Scrivener lease for the purpose of evaluating the property for liquidation. On the basis of the information disclosed in Owens' evaluation report, the fair market value of Central's 13/32nds interest in the lease was fixed at $42,525.78, and this amount was reported by the petitioners on their 1945 returns as the amount distributed by Central in exchange for its stock upon liquidation and was used by petitioners in determining the gain realized from the exchange. In determining the amount of the deficiencies in issue, respondent held that *93 the fair market value of Central's interest in the Scrivener lease at the time of dissolution and distribution was $69,356. The fair market value of the 13/32nds interest of Central in the Scrivener lease at the time of Central's dissolution on or about July 31, 1945, was $51,000. Opinion ARUNDELL, Judge: Fair market value is defined as the price at which property would change hands between a willing buyer and a willing seller neither being under any compulsion to buy or sell. In the instant case no offers were made for the property in question at or about the time of its distribution to the petitioners and any evidence of the price at which other oil properties changed hands at that time would be of little or no value due to the inherent dissimilarity of assets of this character. Therefore, the fair market value of the Scrivener lease may properly be determined from the facts and conclusions contained in the evaluation reports which represent the considered opinion of qualified petroleum engineers and have been submitted by the parties as a basis for our decision. Prior to liquidation, Central retained Frith C. Owens, a geologist and petroleum engineer, to make a detailed *94 evaluation of the Scrivener lease for the purpose of determining its fair market value. The report submitted by Owens charted the western part of the Midway field in 10 foot contour intervals, and disclosed 14 wells in the structure, 12 of which were producing oil as of July 31, 1945; one below the 6,040 foot level, 3 between the 6,040 foot and 6,030 foot levels, 4 between the 6,030 foot and 6,020 foot levels, 2 between the 6,020 foot and 6,010 foot levels, and 2 between the 6,010 foot level and the fault, the latter two wells being the only ones located on the Scrivener lease. Owens calculated an estimated ultimate yield of 4,561.54 barrels per acre, which when applied to the 48 acres of productive sands under the Scrivener lease, gave him a total ultimate yield of 218,954 barrels. Since the lease had produced 128,714 barrels as of May 1, 1945, he estimated the remaining recoverable reserve at 90,240 barrels. Owens reduced this figure to 78,960 barrels to reflect a one-eighth royalty, which when multiplied by $1.35, the prevailing market price of oil, resulted in a present worth of recoverable oil in the amount of $106,596. Eliminating 19 cents per barrel as operating costs and *95 taxes, Owens arrived at a net worth of recoverable oil for the 7/8ths interest in the amount of $91,594. Central's 13/32nds interest was valued at $42,525.78. At respondent's request, Alexander B. Morris, an oil and gas engineer employed by the Bureau of Internal Revenue, made an evaluation of the Scrivener lease as of July 31, 1945. Morris accepted the findings of the Owens report in respect to the physical features of the structure, the sand thickness, porosity, conate water, shrinkage, the recovery factor of 70 per cent determined therein, and the formula used by Owens in applying these factors. As a result, Morris was in agreement with the Owens report in so far as it found the estimated ultimate yield of oil per acre to be 4,561.54 barrels, and the yield per acre foot to be 652 barrels. Morris, however, disagreed with the Owens report as to the total amount of oil recoverable from the Scrivener lease. The source of disagreement was that Morris, conceding the oil in place under the lease to be 4,561.54 barrels per acre at the time of the Owens report, contended that the water drive from the north and west would force additional oil from the pay sands underlying adjacent properties *96 through the wells on the Scrivener lease. To give effect to the water drive, Morris used a different system for determining the ultimate amount of recoverable oil than that employed in the Owens report. The theory upon which Morris based his evaluation was that each of the 12 producing wells on the structure would draw equally from the entire reservoir of oil thereunder until the water advanced to a point where the well lowest on the structure would be drowned out. The remaining wells would then share equally until the next lowest well was drowned out. Morris maintained that this process would continue until the only producing wells would be the two located on the Scrivener lease situated on the highest point of the structure. Morris computed the total recoverable oil between each of the 10-foot contour intervals by determining the number of acre-feet of pay sand therein and multiplying that figure by 652, representing the number of barrels of oil estimated in the Owens report as recoverable per acre foot. Accordingly, he then attributed 2/12ths of the recoverable oil below the 6,040 foot level, 2/11ths of the oil between the 6,040 and 6,030 foot levels, 2/8ths of the oil between *97 the 6,030 and 6,020 foot levels, 2/4ths of the oil between the 6,020 and 6,010 foot levels and 100 per cent of the oil above the 6,010 foot level to the Scrivener lease. From the estimated total ultimate recovery of 423,064 barrels so determined, 128,714 barrels, representing prior production, were eliminated resulting in an estimated future recovery of 294,350 barrels. Employing net value of $1.16 per barrel as used in the Owens report, Morris found the value of Central's 13/32nds interest in the estimated future recovery from the lease as $138,712 and the fair market value of the lease as one-half of this amount, or $69,356. Petitioners also offered the testimony of Horton T. Pruett, a petroleum engineer and consultant, who stated that the water drive was a factor to be considered in fixing the value of the Scrivener lease, and expressed the opinion that the use of a 70 per cent recovery factor for this lease indicated that Owens recognized the effect of the water drive in his report. Pruett also expressed the opinion that an ultimate return in a lease located in the Midway field would constitute a very low return for an investment of this character and where it was assumed that *98 oil would be recovered over and above that underlying the lease, an investor might reasonably expect a return of as high as 3 to 1 on the price he would pay for the lease. The Owens and Morris reports differ in only two material respects, first, in respect to the weight to be given to the water drive in estimating the total ultimate oil recoverable from the lease and, secondly, the discount factor to be used in determining the fair market value. The testimony of the three engineers who testified at the hearing leaves no doubt that the location of the Scrivener lease at the apex of the oil producing structure required any fair estimate of the oil which could be recovered from the lease to take into account the oil underlying neighboring properties, some part of which in all probability would be removed through the two wells on the Scrivener lease. Petitioners point out that the Owens report used a recovery factor of 70 per cent instead of the average 56 per cent and thereby made an adequate allowance for the effect of the water drive. Owens contends that it would have been unreasonable to give greater weight to the water drive, citing the damage to the sands and the faster depletion *99 which might result from high allowables permitted during the war, the faster encroachment of the water from the north than from the west, the possibility that additional wells might be driven in the structure, and the possibility that the two existing wells on the 48 productive acres of the Scrivener lease might be penalized for violating the 40-acre spacing rule as elements that could seriously impair the production of the lease and made any estimate a hazardous guess. It may be conceded that any estimate including oil other than that actually in place below the 48 acres of the Scrivener lease would be hazardous to some degree, but it seems to us that every evaluation of the potential production of an oil property involves a certain amount of risk depending upon the number of actual facts and conditions known to the appraiser and those he must estimate as best he can. However, this risk is normally accepted as part of the oil business and we do not believe that any willing seller or purchaser would have fixed a price for the lease without taking into consideration the possibility that in addition to the oil in place under the 48 acres further quantities of oil would be withdrawn *100 from the wells underlying adjoining properties. It is more likely that the uncertainties of any estimate of the total oil recoverable would have been reflected in the ultimate discount that a purchaser would make in fixing the price he would pay. In this connection, it is clear that the Morris report represents a maximum estimate, the chances being much greater that actual experience would prove it too high rather than too low. In the light of the conditions cited by Owens which might arise to limit production, it is extremely doubtful that any informed purchaser would have accepted the Morris report at its face value and on the basis thereof paid one dollar for a total ultimate recovery of two dollars over an indefinite period of time. We have studied with great care all of the known facts concerning the Scrivener lease disclosed in the Owens and Morris evaluation reports, the opinions expressed by the experts in interpreting those facts, and the testimony as to the ultimate return expected from this type of investment, and on the basis of all this evidence it is our considered opinion that the fair market value of the Scrivener lease at the time of Central's dissolution on *101 or about July 31, 1945, was $51,000, and we so hold. Petitioners filed amendments to their petitions at the hearing claiming that in the event this Court determined a fair market value in excess of that placed upon the lease in their returns, they should then be entitled to cost depletion or statutory depletion, whichever is greater, in redetermining their tax liability for the year ended December 31, 1945. No objection was raised by respondent to this claim and the parties agreed at the hearing that the appropriate adjustments may be made in proceedings under Rule 50. Therefore, Decisions will be entered under Rule 50. Footnotes
*. Proceedings of the following petitioners are consolidated herewith: L. M. Cage, L. N. Cage, L. A. Cage, Jewel Boykin, C. C. Boykin, Ruth Boykin and F. M. Boykin, Jr.↩